Slip Op. 13-30

## UNITED STATES COURT OF INTERNATIONAL TRADE

XINJIAMEI FURNITURE
(ZHANGZHOU) CO., LTD.

       Plaintiff,

              v.

UNITED STATES,

       Defendant.

Before: Richard K. Eaton, Judge

Court No. 11-00456

## OPINION

[Plaintiff's motion for judgment on the agency record is granted, and the matter is remanded to the Department of Commerce.]

Dated: March 11, 2013

*Kutak Rock LLP* (*Lizbeth R. Levinson* and *Ronald M. Wisla*), for plaintiff.

*Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Claudia Burke*, Assistant Director, *Douglas G. Edelschick*, Trial Attorney, Civil Division, Commercial Litigation Branch, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Whitney Rolig*), of counsel, for defendant.

Eaton, Judge:  At issue is whether Commerce's selection of the surrogate value for cold-rolled steel coil as part of a new shipper review under the antidumping duty order on Folding Metal Tables and Chairs from the People's Republic of China ("PRC") was supported by substantial evidence.  Before the court is the motion for judgment on the agency record, made pursuant to USCIT Rule 56.2, of plaintiff Xinjiamei Furniture (Zhangzhou) Co., Ltd. ("plaintiff"

or "Xinjiamei"), an exporter of metal folding chairs from the PRC. By this motion, Xinjiamei

challenges the surrogate value for cold-rolled steel coil used in the Department of Commerce's

("Commerce" or the "Department") Final Results. *See* Folding Metal Tables and Chairs from the

PRC, 76 Fed. Reg. 66,036 (Dep't of Commerce Oct. 25, 2011) (final results of antidumping review

and new shipper review) ("Final Results"), and accompanying Issues and Decision Memorandum

for the Annual 2009–2010 New Shipper Review of the Antidumping Duty Order on Folding Metal

Tables and Chairs from the PRC (Dep't of Commerce Oct. 18, 2011) ("Issues & Dec. Mem.").

In making its argument, Xinjiamei insists that Commerce selected a "surrogate value [for

cold-rolled steel coil that] was aberrational" because 1) the sample size, on which Commerce's

selected value is based, "was infinitesimal when compared" with that of plaintiff's proposed

surrogate value and when compared with "Indian consumption of cold-rolled steel coil during the

Indian fiscal year coinciding with the POR"; 2) the selected value was three times higher than

other surrogate values on the record; and 3) Commerce's selected value was not corroborated by

other record evidence, while plaintiff's proposed surrogate value was corroborated by values it

placed on the record. Pl.'s Mem. of Points & Authorities in Supp. of Mot. for J. on Agency R. 2

(ECF Dkt. No. 21-1) ("Pl.'s Br.").

Defendant argues that Commerce's selection of a surrogate value was based on the best

available information (and its determination was thus supported by substantial evidence) because

the surrogate value "(1) was publicly available, (2) reflected broad market averages, (3) was

contemporaneous with the POR, (4) was tax-exclusive, and (5) was the most specific [Harmonized

Tariff Schedule ("HTS")] category" to the type of steel used by plaintiff. Def.'s Mem. in Opp. to

Pl.'s Mot. for J. on Agency R. 4 (ECF Dkt. No. 23) ("Def.'s Br."). Defendant further maintains

that the surrogate value was not aberrational. Def.'s Br. 4.

For the following reasons, the plaintiff's motion is granted and the matter is remanded.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

## DISCUSSION

I.    Background

On July 29, 2010, at Xinjiamei's request, Commerce initiated a new shipper review under the 2002 antidumping duty order covering the subject metal folding chairs. Folding Metal Tables and Chairs from the PRC, 75 Fed. Reg. 44,767 (Dep't of Commerce July 29, 2010) (initiation of the new shipper review); Folding Metal Tables and Chairs from the PRC, 67 Fed. Reg. 43,277 (Dep't of Commerce June 27, 2002) (antidumping order). The period of review ("POR") was June 1, 2009 through May 31, 2010. Because the PRC is a non-market economy country ("NME"), Commerce was required to "calculate[] a normal value[1] for [Plaintiff] according to its factors of production methodology."[2] Def.'s Br. 2. Plaintiff "participated in the new shipper review by

---

[1]       To determine an exporter's "dumping margin" Commerce subtracts the "export price or constructed export price of the subject merchandise" from the "normal value". *See* 19 U.S.C. § 1677(35)(A).

[2]       Commerce's factors of production methodology is used to determine the normal value of exported merchandise by pricing the factors of production used to produce the merchandise. Commerce does so by using surrogate data from "one or more market economy countries that are—(A) at a level of economic development comparable to that of the [exporter's]

( continued . . . )

responding to all information requests issued by the Department and by submitting surrogate value

information to Commerce both before and after the preliminary results." Pl.'s Br. 3; *see* Def.'s Br.

2. "In the preliminary results, Commerce selected India as the surrogate country[3] and used the

[Global Trade Atlas ("GTA")] data for HTS[4] category 7211.2990[5] to generate a surrogate value

for cold-rolled steel coil of . . . approximately $1,942.80/metric ton (MT) based on an import

quantity of 716.882 MT." Def.'s Br. 2; Folding Metal Tables and Chairs from the PRC, 76 Fed.

Reg. 35,832, 35,839 (Dep't of Commerce June 20, 2011) (preliminary results of antidumping and

new shipper review).

       During the administrative proceedings, plaintiff challenged Commerce's use of the GTA

data and the surrogate value derived from it as failing to meet the "best available information"

---

( . . . continued )

country, and (B) significant producers of comparable merchandise" and then "add[ing] an amount
for general expenses and profit plus the cost of containers, coverings, and other expenses." 19
U.S.C. §§ 1677b(c) (1), (4)(A)–(B) (2006).

    [3]     Neither party challenges the selection of India as the surrogate country.

    [4]     "HTS" refers to the Indian Harmonized Tariff System. Def's Br. 6. The HTS is
India's analogue to the Harmonized Tariff System of the United States ("HTSUS"). Both systems
are based on the World Customs Organization's Harmonized Commodity Coding and
Classification System, and are used to determine the tariff classifications of goods entered into
India and the United States, respectively. Commerce regularly relies upon this type of data when
valuing inputs.

    [5]     The GTA data is "data from the Indian Import Statistics as reported in the Global
Trade Atlas (GTA) for Indian Harmonized Tariff System (HTS) category 7211.2990." Def's Br.
6.

standard.[6]  In addition to its case brief, plaintiff submitted information for an alternate surrogate

value to Commerce and other data it claimed reflected the value of cold-rolled steel coil outside of

India.  Based on its submission, plaintiff argued that Commerce's preferred value, based on the

GTA data, was aberrationally high and that its own proposed surrogate value constituted the best

available information.  Pl.'s Final Surrogate Value Submission (P.R. 51) (Pl.'s Data Submission).

Specifically, plaintiff submitted, as an alternative value, advertising data from "JSW Steel

Limited, one of the four largest Indian producers of steel products" ("JSW advertised data") which

covered the June 2009 to May 2010 POR.  Pl.'s Data Submission 2.  This data was derived from

information published on JSW's website and the submission included calculations made by

plaintiff to adjust the pricing by backing out taxes.  Pl.'s Data Submission 2.  The surrogate value

from the adjusted JSW advertised data was substantially lower than the value derived from the

GTA data.[7]  To corroborate the proposed surrogate value, plaintiff submitted documents showing

"the average unit price of cold-rolled steel coil and sheet sold by JSW Steel [rather than the

advertised price] during the fiscal year April 1, 2009 and March 31, 2010" of $712.94/MT ("JSW

sales data") taken from JSW's Annual Report 2009–2010.  Pl.'s Br. 5.  As shall be seen, this latter

information did not coincide precisely with the POR.

---

[6]       Pursuant to statute, the information used by Commerce to value the factors of
production must be the "best available information regarding the values of such factors in a market
economy country or countries considered to be appropriate."  19 U.S.C. § 1677b(c)(1).

[7]       The value in dollars fluctuates from $733.11/MT to $681.54/MT in plaintiff's brief
and its submission to Commerce.  *Compare* Pl.'s Br. 4, *with* Pl.'s Data Submission 2.  Although
the difference is not explicitly explained, the value in rupees is uniformly 32.99 rs/kg in all sets of
papers.  Therefore, the fluctuation seems to be due to currency valuation changes between the
submissions.

In addition to the JSW data, Xinjiamei provided evidence relating to non-Indian pricing of

cold-rolled steel. This evidence included "monthly cold roll steel coil prices from Brazil"

("Brazilian data") reflecting the period of June 2009 to February 2010, "ex factory cold-rolled

steel prices from Northern Europe" ("Northern European data") covering the period of February

23, 2009 to April 27, 2009, and "world export market 'benchmark' prices" ("Benchmark data")

covering the period of July 2010 to December 2010, all of which were taken from the metals.com

website. Pl.'s Br. 5. The values reflected in these sources ranged from $524.12/MT[8] to $743/MT.

Pl.'s Br. 5.

With respect to the volume of cold-rolled steel found in the data plaintiff placed on the

record, the JSW sales data also showed that Commerce's GTA data represented less than

one-fiftieth of one percent of the cold-rolled steel production of only *one* Indian domestic

producer, JSW Steel. Commerce does not dispute that this is the case.

In the Final Results, Commerce continued to use the GTA data. *See* Final Results Fed.

Reg. at 66,037; Issues & Dec. Mem. at 3. The department acknowledged that "in the past [it]

considered high average unit values . . . based on relatively small aggregate quantities to be

potentially aberrational data." Issues & Dec. Mem. at 3. Nonetheless, it stated that "it [did] not

automatically reject" data based on a small quantity if "other market data indicates that the per unit

values of those imports fall within a reasonable range." Issues & Dec. Mem. at 3. It is worth

noting that, having made this statement, Commerce pointed to no other market information

indicating that its chosen surrogate value was within a reasonable range.

---

[8]     This number appears in the parties' submissions in gross tons but has been
converted into MT here for ease of comparison.

The Department also found that the other data offered by Xinjiamei was insufficient "to demonstrate that the per-unit value under [the GTA data was] aberrational." Issues & Dec. Mem. 3–4. According to Commerce, it disregarded the Brazilian data, the Northern European data, and the Benchmark data because they did not sufficiently overlap with the POR and because they represented export data from countries that were not potential surrogate countries. Issues & Dec. Mem. at 4. For Commerce, "these export prices [were] not relevant to the prices paid by producers [of the subject merchandise] in India because [they] do not reflect the domestic or import prices paid by producers [of the subject merchandise] in India." Issues & Dec. Mem. at 4. The Department therefore concluded that Xinjiamei's corroborative data did not demonstrate that the GTA data was aberrational or that the JSW data was the best available information. Issues & Dec. Mem. at 4.

Commerce also determined that the GTA data was more reflective of domestic prices in India. Commerce "disagree[d] . . . that the existence of lower AUV prices of a single company [JSW] constitutes sufficient evidence to compel the Department to question the use of the [GTA] data." Issues & Dec. Mem. at 5. Commerce reasoned that the JSW data was unreliable because the data was sales offers, not records of actual sales, and came from only one company. Issues & Dec. Mem. at 5. Because Commerce "prefers to value factors using prices that are broad market averages," the GTA data, representing all Indian imports, was preferable. Issues & Dec. Mem. at 5.

Based on these findings, Commerce took no steps to evaluate independently the reliability or non-distortive quality of its preferred GTA data, even though it was aware that it was dealing with a data set more than a thousand times smaller than others on the record. Notably, Commerce did not discuss the sample size of its preferred GTA data at all, other than to observe that in one

prior review it had found country-wide import statistics from a small data set preferable to a

specific company's statistics based on a larger data set.[9]  In other words, Commerce only indicated

that it preferred country-wide data here, even though that data represented a comparatively tiny

sample.  Commerce did not explain how such a small sample, even if based on country-wide data,

yielded a non-aberrational surrogate value.


II.     Legal Framework

        Under 19 U.S.C. § 1675(a)(2)(B), Commerce shall, upon request, conduct administrative

reviews "for new exporters and producers."  The purpose of these new shipper reviews is to

determine whether exporters or producers, whose sales have not been previously examined, are (1)

entitled to their own antidumping duty rates under an order, and (2) if so, to calculate those rates.

*See Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603, 604, 374 F. Supp. 2d 1333,

1335 (2005).

        Here, Commerce found that plaintiff was entitled to its own rate and commenced to

determine that rate by calculating normal value.  When merchandise that is the subject of a new

shipper review is exported from a nonmarket economy country,[10] such as the PRC, Commerce,

---

[9]        The determination to which Commerce cites, Prestressed Concrete Wire Strand
from the PRC, 75 Fed. Reg. 28,560 (Dep't of Commerce May 21, 2010) (final determination of
sales at less than fair value) ("PC Strand"), was never appealed to this Court.  It also deals with a
distinguishable ratio from that present here.  There, the ratio of sample size of the underlying
import statistics to the sample size of the underlying company data was roughly 1:3.  PC Strand's
Issues & Dec. Mem. at Comment 1.b, 75 ITADOC 28560, 2010 WL 2150320 (ITA).  Here, the
ratio of imports to sales is roughly 1:2000.  Pl.'s Br. 12.

[10]       A "nonmarket economy country" is "any foreign country that [Commerce]
determines does not operate on market principles of cost or pricing structures, so that sales of

                                                                              ( continued . . . )

Court No. 11-00456                                                                     Page 9

under most circumstances, determines normal value by valuing the factors of production used in

producing the merchandise by employing surrogate data.[11]  The statute directs Commerce to value

the factors of production "based on the best available information regarding the values of such

factors in a market economy country or countries considered to be appropriate by the

[Department]." 19 U.S.C. § 1677b(c)(1).  Specifically, Commerce's task in a nonmarket economy

review is to determine, using surrogate costs, what a producer's costs would be if the inputs were

valued at market prices.  *See Tianjin Mach. Imp. & Ex. Corp. v. United States*, 16 CIT 931, 940,

806 F. Supp. 1008, 1018 (1992).

When determining prices for the factors of production, Commerce must decide what

evidence constitutes the best available information to determine their value.  A reviewing court

determines not whether "the information Commerce used was the best available, but rather

whether a reasonable mind could conclude that Commerce chose the best available information."

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)

(citation and internal quotation marks omitted).  Nonetheless, Commerce's determination cannot

---

( . . . continued )

merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. §
1677(18)(A).  "Because it deems China to be a nonmarket economy country, Commerce generally
considers information on sales in China and financial information obtained from Chinese
producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the
subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318
F. Supp. 2d 1339, 1341 (2004).  Therefore, because the subject merchandise comes from the PRC,
Commerce constructed normal value by pricing the factors of production using surrogate data
from India. *See* 19 U.S.C. § 1677b(c)(4).

[11]     Section 1677b(c)(4)(A) requires that "in valuing factors of production, [the
Department] shall utilize, to the extent possible, the prices or costs of factors of production in one
or more market economy countries that are . . . at a level of economic development comparable to
that of the nonmarket economy country."

be opaque as to methodology. Indeed, in making the determination, "Commerce must provide a

rational explanation for its choice." *Peer Bearing Co.-Changshan v. United States*, 35 CIT __,

__, 752 F. Supp. 2d 1353, 1372 (2011) (citations omitted).

     Commerce is further obligated to "establish[] antidumping margins as accurately as

possible." *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir.

2001). Thus, "[w]hen confronted with a colorable claim that the data that Commerce is

considering is aberrational, Commerce must examine the data and provide a reasoned explanation

as to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v. United

States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007) (citation omitted). In such a case, it

is not enough for Commerce to "summarily discard the alternatives as flawed," Commerce must

also "evaluate the reliability of its own choice." *Shanghai Foreign Trade Enters. Co., Ltd. v.

United States*, 28 CIT 480, 495, 318 F. Supp. 2d 1339, 1352 (2004); *see also Guangdong Chem.

Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1417, 460 F. Supp. 2d. 1365, 1369 (2006).


III.    Commerce's Selection of the GTA Data is Not Supported By Substantial Evidence

     From a review of the record and of the facts and reasoning found in the Issues and Decision

Memorandum, the court concludes that Commerce has failed to provide a rational explanation for

its selection of the GTA data as the best available information on the record. Commerce's

discussion in the Issues and Decision Memorandum skips a critical analytical step by failing "to

question the use of the" GTA data when other evidence on the record casts doubt on the reliability

of its choice. Issues & Dec. Mem. 5.

     As noted above, this Court has repeatedly held that questionable data may not be chosen

"only on the claim that the data selected was better than other data" on the record. *Mittal Steel*

*Galati*, 31 CIT at 1135, 502 F. Supp. 2d at 1308 ("When confronted with a colorable claim that the

data that Commerce is considering is aberrational, Commerce must examine the data and provide a

reasoned explanation as to why the data it chooses is reliable and non-distortive. Here, confronted

with data that indicates that Commerce chose low volume, aberrational data, Commerce did not

evaluate the data on the record in comparison to benchmarks, but instead relied only on the claim

that the data selected was better than other data from the acceptable surrogate countries.

Therefore, Commerce's decision skips over [plaintiff's] claim that [the selected] data is outside

Commerce's own standard of acceptability, and thus avoids an important aspect of the problem

presented." (citations omitted)). When data, giving a basis to question the reliability of a surrogate

value Commerce has selected is placed on the record, however, the Department must explain why

its selected data meets its "own standard of acceptability." *Id.*; *Shanghai Foreign Trade Enters.*,

28 CIT at 495, 318 F. Supp. 2d at 1352 ("Commerce did not explain its decision to deviate from its

past practice, under which it normally would ensure that a small quantity of imports did not

produce a price that is aberrational relative to other sources of market value. Before Commerce

can choose among various values to select the most accurate, it must, consistent with its practice,

discard those that are unreliable. . . . Commerce [must] evaluate the reliability of its own choice.");

*Guangdong Chem.*, 30 CIT at 1417, 460 F. Supp. 2d. at 1369 ("Commerce's analysis must do

more than simply identify flaws in the data sets it rejects.").

   The Department's position is that it need not evaluate the GTA data as potentially

aberrational because Xinjiamei did not place sufficient evidence on the record indicating that the

GTA data was outside of the norm. In other words, Commerce argues that its rejection of the

Brazilian data, Northern European data, and Benchmark data left the record bare of any evidence

that the GTA data was aberrational. Curiously, in reaching this conclusion, Commerce did not

address whether the JSW data provided a basis to doubt the accuracy of the GTA data.

The Department's position is untenable. Xinjiamei did indeed place sufficient data on the record for a reasonable mind to question whether the GTA data was aberrational. To start, Xinjiamei demonstrated that the GTA data represented less than one-fiftieth of one percent of the cold-rolled steel production of only *one* domestic producer, JSW Steel. *See* Issues & Dec. Mem. at 3 ("[Plaintiff] avers that the import statistics' 716.882 metric tons of cold rolled steel coil imports is 'infinitesimal' as compared to the consumption of cold rolled steel coil in India since the import statistics represent 0.047 percent of JSW Steel Limited's production of cold rolled steel coils and sheet."). Commerce does not dispute that this is the case. Indeed, the Department does not quarrel with plaintiff's conclusion that, because JSW steel was but one of four large Indian producers of cold-rolled steel, the small size of the GTA data when compared to the JSW data also indicates that the GTA data represents a truly miniscule percentage of overall Indian cold-rolled steel production.

It is apparent that Commerce skipped a critical step by failing to explain why, in light of the foregoing, its GTA data would not produce an aberrational surrogate value. That is, the evidence produced by plaintiff is sufficient to cause any reasonable mind to seek some explanation as to how such a small sample could be non-distortive and potentially "the best available information." *See Zhejiang DunAn Hetian Metal*, 652 F.3d at 1341. Indeed, where "the Commerce decision fails to establish that the small amount [of imports underlying the selected data] was statistically or commercially significant," remand is appropriate for Commerce to do so, including issuance of an instruction that Commerce "state its method for determining what is an insignificant quantity." *Shanghai Foreign Trade Enters.*, 28 CIT at 495–96, 318 F. Supp. 2d at 1352–53. *Cf. Trust Chem Co. v. United States*, 35 CIT __, __, 791 F. Supp. 2d 1257, 1265 (2011) (indicating that evidence

showing that the "relative quantity of imports [underlying a surrogate value] is distortive" may be

enough, even absent evidence of price, to render data aberrational).

It is worth noting that the proposition that a small import volume *may indicate* that the data

relied upon is aberrational is not the same as the proposition that a small import volume *makes* the

data aberrational. Thus, the Government's position that Commerce's ordinary practice is not to

"automatically reject import data based on a low aggregate value if a comparison with other

market data indicates that the per-unit values of those imports fall within a reasonable range" is not

inconsistent with this opinion. Issues & Dec. Mem. at 3. Rather, a very small relative quantity of

imports triggers an obligation for Commerce to explain why the data is not aberrational. It does

not mean the data must be "automatically rejected."

Commerce, in its Issues and Decision Memorandum, states that it will not "automatically

reject" a value based on a small sample *if other market data indicates that the value falls within a

reasonable range of market-driven prices*. Here, however, the Department points to no evidence,

let alone market evidence, that the GTA data yields a value within a reasonable range, and has

chosen to disregard evidence that the value is outside of this range. Issues & Dec. Mem. at 4.

As to the value of the steel coil itself, the disregarded evidence that Xinjiamei placed on the

record indicates that the per-unit value derived from the GTA data is significantly higher than

other values for cold-rolled steel coil on the world market. As noted, the additional data sets

reflected values ranging from $524.12/MT to $743/MT. When compared with the $1,943.80/MT

value derived from the GTA data, the difference in price, between two hundred and nearly four

hundred percent, is clearly substantial. *See, e.g., Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at

1372–4 (remarking that a sixty percent price differential was substantial).

   The Department, however, concluded that the Brazilian data, the Northern European data,

and the Benchmark data were not probative because they did not overlap the POR precisely and

because they represented export data from countries that were not potential surrogates.  It can be

presumed, however, that these countries were not candidates to be surrogates because they are at a

different stage of development than China, not because the prices were determined by other than

market forces.  *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, at __, 804 F. Supp. 2d.

1337, 1354 (2011) ("The statute contemplates the use of data from countries at a comparable level

of development as the nonmarket economy country as the source of a surrogate value; it does not

prohibit Commerce from considering data from developed countries as evidence to determine

which information is the best available.") (citation omitted).  Thus, while the prices might not

satisfy the requirements for surrogate values, they are sufficient to call into question the reliability

of the GTA data.

   Next, Commerce failed to discuss further evidence that the GTA data did not represent

Indian domestic prices.  That is, there was a significant disparity between the values derived from

the JSW advertised data, as confirmed by the JSW pricing data, and Commerce's selected value.

*See* Pl.'s Br. 10 ("Commerce's chosen surrogate of $1,943.80 per metric ton is almost three times

higher than the [advertised] JSW Steel price of $681.53 per metric ton.").  The per-unit value

derived from the JSW advertised data is $681.53/MT reflecting a divergence between the GTA

data and the other values on the record that is still well in excess of two hundred percent.

Commerce's argument that the JSW data was not probative because it represented offered prices

and not actual sales is unconvincing.  There is no evidence that the offered prices were not

legitimate and plaintiff placed on the record evidence that actual sales were made at prices not

markedly different from the offered prices.  *See* Pl.'s Br. 5 ("[T]he average unit price of cold-rolled

steel coil and sheet sold by JSW Steel during the fiscal year . . . coinciding with 10 months of the

period of review . . . [was] $712.94 per metric ton."). While JSW's average sales price does not

cover the entire POR, it represents sales for ten months of the twelve month period and is strong

evidence supporting the reliability of the offered prices.

It is evident that Commerce was premature in finding that the GTA data was preferable to

the JSW advertised data. That is, the Department was required to first determine whether the GTA

data was reliable and that it was not aberrational before comparing it to the JSW advertised data.

Where there are valid questions raised about the reliability of data based upon a small number of

imports this "court remands [the] issue to Commerce for further explanation in light of the

[conflicting] data." *Mittal Steel Galati*, 31 CIT at 1135, 502 F. Supp. 2d at 1307; *Shanghai*

*Foreign Trade Enters.*, 28 CIT at 495, 318 F. Supp. 2d at 1352 ("Before Commerce can choose

among various values to select the most accurate, it must, consistent with its practice, discard those

that are unreliable."). As a consequence, the Final Results lack a lawful explanation, supported by

substantial evidence, for Commerce's selection of the GTA data as the surrogate value for the

input of cold-rolled steel coil.

### CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

ORDERED that plaintiff's motion for judgment on the agency record is GRANTED, and

Commerce's Final Results are REMANDED; it is further

ORDERED that, upon remand, Commerce shall issue a redetermination that complies in

all respects with this Opinion and Order, is based on determinations that are supported by

substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that, should Commerce continue using the GTA data, it must provide an adequate explanation, supported by substantial evidence, as to why that data is reliable and non-aberrational.  In making this determination, Commerce must take into account the Brazilian data, the Northern European data, the Benchmark data, the JSW advertised data, and the JSW price data.  Following that determination, the department shall determine a surrogate value for cold-rolled steel coil based on the best available information standard.  In reaching its determination as to the best information available, Commerce shall expressly compare the merits of any acceptable data sets on the record; it is further

ORDERED that the Department may reopen the record to solicit any information it determines to be necessary to make its determination; it is further

ORDERED that the remand results shall be due on July 8, 2013; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due fifteen (15) days following filing of the comments.


                                                    /s/ Richard K. Eaton
                                                    Richard K. Eaton


Dated:           March 11, 2013
                 New York, New York