Slip Op. 14-17

UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————— :
XINJIAMEI FURNITURE                          :
(ZHANGZHOU) CO., LTD.,                       :
                                             :
     Plaintiff,                             :
                                             :
             v.                    :    Before: Richard K. Eaton, Judge
                                             :
UNITED STATES,                               :    Court No. 11-00456
                                             :
     Defendant.                             :
                                             :
————————————————————— :

OPINION

[The Department of Commerce's Final Results of Redetermination in this New Shipper Review are Sustained.]

Dated: February 18 2014

*Kutak Rock LLP* (*Lizbeth R. Levinson* and *Ronald M. Wisla*), for plaintiff.

*Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White*, Assistant Director, *Douglas G. Edelschick*, Trial Attorney, Civil Division, Commercial Litigation Branch, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Joanna V. Theiss*), of counsel, for defendant.

Eaton, Judge:  Before the court are the Department of Commerce's ("the

Department" or "defendant") Final Results of Redetermination Pursuant to Court Remand in this

New Shipper Review.  Final Results of Redetermination Pursuant to Court Remand (ECF Dkt.

No. 32-1) ("Remand Results").  At issue is whether the Department complied with the court's

remand order instructing it to "provide an adequate explanation, supported by substantial

evidence, as to why [the data set relied upon in the Final Results to calculate the surrogate value

for cold-rolled steel coil is] reliable and non-aberrational." *Xinjiamei Furniture (Zhangzhou) Co.*

*v. United States*, 37 CIT __, __, Slip Op. 13-30, 16 (2013).

Plaintiff Xinjiamei Furniture (Zhangzhou) Co., Ltd. ("plaintiff" or "Xinjiamei") objects

to Commerce's continued use of import data from Indian HTS category 7211.2990 ("Indian

Import Data"), as reported in the Global Trade Atlas ("GTA"), including questioning the

Department's use of new data placed on the record during the remand to show that the GTA

Indian Import Data does not yield an aberrational average unit value ("AUV"). *See* Cmts.  on

Remand Results 2–3 (ECF Dkt. No. 34) ("Pl.'s Cmts. ").

Defendant argues that the court should not entertain plaintiff's objections because

"Xinjiamei failed to exhaust its administrative remedies" when it did not comment on the Draft

Results of Redetermination Pursuant to Court Remand ("Draft Results").  Def.'s Reply to Pl.'s

Cmts. Regarding the Remand Redetermination 2 (ECF Dkt. No. 35) ("Def.'s Reply").

Defendant continues that the Remand Results comply with the court's instructions in *Xinjiamei*

and its determination is supported by substantial evidence and in accordance with law.

It is undisputed that plaintiff failed to raise any of the arguments it raises here when given

an opportunity to comment on the Draft Results during the proceedings on remand.  Draft

Results at 15 (ECF Dkt. No. 38-11) ("Interested parties will have an opportunity to comment on

these draft remand results.  Interested parties may submit comments to the Department by close-

of-business on May 31, 2013.  Any comments will be addressed in our final remand results.").

Because plaintiff did not exhaust its administrative remedies, the court will not consider the

arguments it makes here for the first time.  Accordingly, and because the Department has

complied with the court's instructions in *Xinjiamei* and its conclusions are supported by

substantial evidence on the record, the Remand Results are sustained.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i) (2006).  The results of a redetermination pursuant to court remand are

also reviewed "for compliance with the court's remand order."  *Nakornthai Mill Public Co. v.

United States*, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008).


## DISCUSSION

I.   Background

On July 29, 2010, at Xinjiamei's request, Commerce initiated a new shipper review,

covering a period of review ("POR") from June 1, 2009 through May 31, 2010.  Folding Metal

Tables and Chairs From the People's Republic of China ("PRC"), 75 Fed. Reg. 44,767 (Dep't of

Commerce July 29, 2010) (initiation of the new shipper review); Folding Metal Tables and

Chairs from the PRC, 67 Fed. Reg. 43,277 (Dep't of Commerce June 27, 2002) (antidumping

duty order).  During the initial administrative proceedings, the Department selected India as the

surrogate country, placed the GTA Indian Import Data on the record, and used it to generate a

surrogate value for cold-rolled steel coil.  *Xinjiamei* at __, Slip Op. 13-30, at 4.  As an alternative

value, plaintiff placed on the record before Commerce advertising data from one of the largest

Indian steel producers, JSW Steel Limited ("JSW").  To support its alternative value, plaintiff

also submitted sales data from JSW and data taken from the metals.com website showing

monthly cold-rolled steel prices from Brazil ("metalprices.com Brazilian Data"), "ex factory

cold-rolled steel prices from Northern Europe," and "world export market benchmark prices."

*Id*. at __, Slip Op. 13-30, at 5–6 (internal quotation marks omitted).  Plaintiff argued that the

Department should have used the JSW advertising data as the best available information[1] on the

record because (1) the JSW advertising data was supported by the other information plaintiff

provided, and (2) because of the small quantity of imports it represented, the GTA Indian Import

Data yielded an aberrational surrogate value.  *Id*. at __, Slip Op. 13-30, at 4–6.

In the Final Results, Commerce continued to use the GTA Indian Import Data, arguing

that it was within its discretion to select data based on a small quantity of imports as the best

available information, so long as other evidence before the Department showed the resulting per

unit values derived from GTA Indian Import Data were within a "reasonable range."  *Id*. at __,

Slip Op. 13-30, at 6; *See* Folding Metal Tables and Chairs from the PRC, 76 Fed. Reg. 66,036

(Dep't of Commerce Oct. 25, 2011) (final results of antidumping review and new shipper

review) ("Final Results"), and accompanying Issues and Decision Memorandum for the Annual

2009–2010 New Shipper Review of the Antidumping Duty Order on Folding Metal Tables and

Chairs from the PRC (Dep't of Commerce Oct. 18, 2011) ("Issues & Dec. Mem.").  The

Department also found that the data placed on the record by plaintiff failed to show the GTA

Indian Import Data to be aberrational.  *Xinjiamei* at __, Slip Op. 13-30, at 7.  Moreover,

Commerce rejected the use of the JSW advertised prices as the best available information

because the data represented offers, rather than sales, and came from only one company.  *Id*.

---

[1]        19 U.S.C. § 1677b(c)(1) directs the Department to value factors of production
"based on the best available information regarding the values of such factors in a market
economy country or countries considered [by the Department] to be appropriate."

The Department, however, neither expressly evaluated whether the GTA Indian Import Data

yielded an aberrational AUV nor compared the AUV yielded by the GTA Indian Import Data to

other market prices.  *Id*.  Rather than comparing the GTA Indian Import Data with the other

evidence placed on the record by plaintiff, the Department discounted the other data sets and

concluded that the GTA Indian Import Data was superior by process of elimination.

In *Xinjiamei*, the court remanded the Final Results, "conclud[ing] that Commerce ha[d]

failed to provide a rational explanation for its selection of the GTA [Indian Import D]ata as the

best available information on the record."  *Id*. at __, Slip Op. 13-30, at 10.  Because the

Department did not assess whether the GTA Indian Import Data met the Department's own

standards for reliability, the court found that Commerce had "skip[ped] a critical analytical step

by failing to question the use of the GTA [Indian Import D]ata when other evidence on the

record cast[] doubt on the reliability of its choice."  *Id*. (internal quotation marks omitted).  The

court held that "questionable data may not be chosen 'only on the claim that the data selected

was better than other data' on the record" and that "'Commerce's analysis must do more than

simply identify flaws in the data sets it rejects.'"  *Id*. (quoting *Mittal Steel Galati S.A. v. United

States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007), and *Guangdong Chem. Imp. &

Exp. Corp. v. United States*, 30 CIT 1412, 1417, 460 F. Supp. 2d 1365, 1369 (2006)).

Accordingly, the court remanded the case for the Department to more thoroughly explain why, in

light of all of the record evidence, its selection of the GTA Indian Import Data as the best

available information was supported by substantial evidence.

On remand, the court instructed that:

[S]hould Commerce continue using the GTA [Indian D]ata, it must provide an
adequate explanation, supported by substantial evidence, as to why that data is
reliable and non-aberrational. . . . Commerce must take into account the Brazilian

> data, the Northern European data, the Benchmark data, the JSW advertised data,
> and the JSW price data. . . . [Commerce] shall determine a surrogate value for
> cold-rolled steel coil based on the best available information standard. . . [and]
> expressly compare the merits of any acceptable data sets on the record.

*Xinjiamei,* at __, Slip Op. 13-30, at 16.  The court permitted the Department to "reopen the

record to solicit any information it determines to be necessary to make its determination."  *Id*.

Prior to issuing the Draft Results, the Department reopened the record and added: "(1)

GTA [Indian] import data from the other potential surrogate countries covering the POR; (2)

Brazilian GTA export data for cold-rolled steel coil during the POR; (3) Brazilian GTA export

data" covering the same period reflected in plaintiff's metalprices.com Brazilian data.  Draft

Results at 3.  For its part, "Xinjiamei placed on the record a chart obtained from London Metal

Exchange Free Data Service [("London Metal Exchange data")] showing prices for steel billet in

the Far East market during the POR" which it "claimed . . . further supports using the JSW

[sales] prices."  Draft Results at 3.  In its submission, Xinjiamei raised no arguments other than

to claim that the London Metal Exchange data supported its proposed AUV and undermined the

AUV calculated from the GTA Indian Import Data.  *See* Letter from Lizbeth R. Levinson and

Ronald M. Wisla, Kutak Rock LLP, to Sec'y of Commerce at 1–2, PD 10 at bar code 3130529-

01 (Apr. 17, 2013),  ECF Dkt. No. 38-10 ("London Metal Exchange Letter").

In the Draft Results, the Department "continue[d] to find that the GTA Indian import data

are the best available information for valuing Xinjiamei's cold-rolled steel coil and that the data

are reliable and non-aberrational."  Draft Results at 3–4.  Conceding that the HTS categories

were not identical for each country at the eight-digit level used for this comparison,[2] the

Department nonetheless found that the $2.01/kg AUV for the GTA Indian Import Data that it

used in the Final Results fell within a reasonable range.  This was because "the GTA import

AUVs covering the POR for the HTS category of cold-rolled steel that is most specific to

Xinjiamei's inputs from" Indonesia, Peru, Thailand, and Ukraine, yielded a range of $1.22/kg to

$8.26/kg.[3]  Draft Results 4–5.  The Department also found that the volume of imports underlying

the GTA Indian Import Data, 716,835 kg, also represented "significant quantities of imports"

because it "is within" the 57,070 kg to 2,301,882 kg range of import quantities imported into

Indonesia, Peru, Thailand, and Ukraine.  Draft Results at 5.

     To further support its selection, the Department also compared the GTA Indian Import

Data with "import data from the POR for HTS category 7211.29, 'Flat-Rolled Iron Or Nonalloy

Steel Products Nesoi, Under 600 Mm Wide, Hot-Rolled, Not Clad, Plated Or Coated, Under 4.75

Mm Thick'" which covered cold-rolled steel from India and the other potential surrogate

---

[2]     The tariff schedules of signatories to the Harmonized System Convention are required to have tariff categories "harmonized with the internationally-developed HS nomenclature up to the six-digit level, *i.e.*, to the two-digit 'chapter,' the four-digit 'heading,' and the six-digit 'subheading' levels." *Victoria's Secret Direct, LLC v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1332, 1345 (2013) (citing Investigation with Respect to the Operation of the Harmonized System Subtitle of the Omnibus Trade and Competitiveness Act of 1988 at 1 (USITC Pub. No. 2296) (June 1990)).  Beyond the six-digit level each individual nation may further subdivide its tariff schedule in a manner that is not harmonized with the other signatories.  The eight-digit headings that cover cold-rolled steel coil are not identical across all of the potential surrogate countries.  As part of its analysis, the Department identified and compared the eight-digit headings that cover cold-rolled steel coil, even though the language and scope of those headings is not exactly the same.

[3]     It is worth noting that, because of its small volume, the Department excluded data from the fifth potential surrogate country, the Philippines, from the eight-digit level comparison.  Had that data been included, however, the GTA Indian Import Data's AUV would still fall within the range of all six potential surrogate countries.  *See* Draft Results at 5.

countries (Indonesia, Peru, the Philippines, Thailand, and Ukraine).  Draft Results at 5–6.  While

noting that this information "is less specific than both the eight-digit HTS category used in the

Final Results and the" eight-digit data used for the first comparison in the Draft Results, the

Department found that this "data set is helpful because HTS category 7211.29 is harmonized at

[the] six-digit level" across all of the potential surrogate countries.  Draft Results at 6.  Thus, to

balance out its comparison across the eight-digit tariff subheadings, which were not harmonized

across all of the surrogate countries, the Department also compared its selected value to the

AUVs derived from the data of the six-digit subheadings, which, although less specific, are

harmonized across all of the surrogate countries.

Commerce concluded that a comparison with this data set also showed that the GTA

Indian Import Data fell within a reasonable range because the $2.01/kg AUV was within the

range of $1.56/kg to $2.95/kg AUVs for the other potential surrogate countries.  Draft Results at

6.  The Department also found that the volume of imports under the GTA Indian Import Data

(716,882 kg) was not aberrational because it was within the 2,808 kg to 11,500,005 kg range of

import quantities for the other surrogate countries.  Draft Results at 6.  In other words, the

Department found that the GTA Indian Import Data's volume and AUV were not aberrational

because they were comparable to the volumes and AUVs yielded by examining imports into the

other surrogate countries.

As directed by the court, the Department also specifically addressed the reliability of the

JSW advertised prices.  It found that the JSW advertised prices "are not the best available

information because the data are less specific than GTA Indian import data and do not represent

a broad industry-average price."  Draft Results at 6.  Regarding specificity, the Department

concluded that the JSW advertised data does not "specify the width of the cold-rolled steel coil it

sells." Draft Results at 6.  By contrast, the GTA Indian Import Data "specifies the width of the cold-rolled steel coil it covers" and the covered range encompasses the width of cold-rolled steel coil Xinjiamei "used to produce subject merchandise."  Draft Results at 7.  Moreover, the Department concluded that the GTA Indian Import Data represented a "broad industry-average" because that data was "collected from an official government source" and "reflect[s] numerous transactions between many buyers and sellers," and that the JSW advertised data did not represent a broad industry-average because it was "based on the price from a single factory." Draft Results at 7.

Commerce added that it found the JSW advertised data to be less reliable than the GTA Indian Import Data.  According to the Department, the only record evidence that supported the JSW advertised data was from the Philippines.  The Department concluded, however, that the Philippine data was too small to be reliable because "the import quantity is only 2,100 kg." Draft Results 5.  The Department thus concluded that the GTA Indian Import Data was more reliable because it was supported by record evidence from five of the other potential surrogate countries while the JSW advertised data was only supported by one, unreliable data set.  Draft Results at 6, 7.

The Department also examined the JSW sales data.  It determined that it could not rely on that data as it "may be distortive because the sales quantity covers all cold-rolled steel coil and sheets," which includes products that could fall under twelve different tariff headings.  Draft Results at 8.  Put another way, the JSW sales data was not specific to the type of input used by plaintiff and represented sales of many different kinds of cold-rolled steel coil and sheets.  The Department also faulted the JSW sales data because the AUV it yields falls outside the range of AUVs from all other potential surrogate countries except for the Philippines.  As noted,

Commerce concluded the Philippine sata was derived from an aberrationally small number of imports.  Draft Results at 8.

Also, as instructed by the court, the Department expressly considered the metalprices.com Brazilian data placed on the record by Xinjiamei prior to the issuance of the Final Results.  Commerce then compared that data with the two sets of Brazilian GTA export data that the Department placed on the record on remand.  Draft Results at 9.  Xinjiamei's Brazilian data from metalprices.com (which reflected nine-months that were not identical with the POR) yielded an AUV of $0.59/kg, while Commerce's Brazilian GTA data yielded an AUV of $2.10/kg during the POR and an AUV of $2.05 during the same period as the Brazilian data from metalprices.com.  Draft Results at 9.  The Department found that the Brazilian GTA export data was more reliable because that data was "derived from official government statistics" and the record contained no evidence as to how the metalprices.com Brazilian data was gathered.  Draft Results at 9.  The Department also concluded that the Brazilian data from metalprices.com was not the best available evidence when compared to the GTA Indian Import Data "because the data are from Brazil, not India" and India was the primary surrogate country.  Draft Results at 10.

Further, in accordance with the remand instructions, the Department also considered the Northern Europe and World Export Market Benchmark data placed on the record by Xinjiamei.  The Department determined that it could not rely on those prices because "[r]ecord evidence does not explain how metalprices.com compiles its pricing data[,] . . . whether the prices are based on commercial and actual transactions between unaffiliated buyers and sellers[,] . . . and whether the[] quantities are commercially significant."  Draft Results at 11.  The Department also reiterated its reasoning in the Final Results that the Northern Europe and World Export

Market Benchmark data "are not suitable because neither of the data sets covers any portion of

the POR[,] . . . export prices . . . are not representative of the domestic or import prices paid by

producers of the like product in India[,] . . . [and] the Department is unable to compare and verify

the export prices and quantities using other sources because the descriptions 'Northern Europe'

and 'world export market' are vague and undefined." Draft Results 11–12.

    Commerce also concluded that the Northern Europe and World Export Market

Benchmark data were "not the best available information on the record to value cold-rolled steel

coil because" the AUVs derived from those data sets ($0.62 and $0.71) "are not within the range

of AUVs for the other potential surrogate countries" for which reliable data was on the record.

Draft Results 12. Thus, the Department found that these data sets were less reliable than the

GTA Indian Import Data because the GTA Indian Import Data was better supported by other

record evidence.

    The Department also addressed the new London Metal Exchange data placed on the

record by Xinjiamei during the remand proceedings. According to Commerce, that data

represented "the cash buyer price of steel billet,[4] not cold-rolled steel coil, in Far East markets

during the POR." Draft Results at 12. The Department rejected Xinjiamei's claim that "steel

billet [was] the type of steel used to fabricate cold-rolled steel sheet used to produce the subject

merchandise" because plaintiff provided "no explanation (*e.g.*, width, thickness, carbon level

---

    [4]    Steel billet is "[a] semi-finished hot rolled product, usually of square section with
radiused corners, produced by the hot rolling of blooms. . . . Billets are further processed by hot
rolling into bar stock." DICTIONARY OF MATERIALS AND MANUFACTURING 37 (Vernon John ed.
1990). By contrast, cold-rolled steel coil is a "finished steel product such as strip or sheet that
has been wound or coiled after rolling." *See*, *A Guide to the Language of Steel: Coil*,
ARCELORMITTAL, http://corporate.arcelormittal.com/news-and-media/factfile/steel-terminology
(last visited Jan. 21, 2014).

content, and processing method of the steel billet) supported by evidence to substantiate this

claim." London Metal Exchange Letter 1; Draft Results at 13.  The Department then compared

the London Metal Exchange AUV ($0.47/kg) to the AUV from the GTA Indian Import Data and

the GTA data from the other potential surrogate countries, finding the London Metal Exchange

data to be aberrational because its AUV "is not within the range of AUVs for India and the other

potential surrogate countries."  Draft Results at 13.  Specifically, the $0.47/kg AUV of the

London Metal Exchange data is not within the $1.22/kg to $8.26/kg AUV range.  Draft Results

at 13.  The Department further found the London Metal Exchange data unreliable because "even

if Xinjiamei's explanation" that the steel billet was used to create the cold-rolled steel sheets

used by plaintiff to manufacture the subject merchandise "is correct, the prices for steel billet

should be lower [that those for cold-rolled steel sheet] because [they do] not account for the

additional processing necessary to produce cold-rolled steel sheets."  Draft Results at 13.

Commerce also identified several other bases for rejecting the London Metal Exchange

prices as a benchmark.  For example, the Department stated that it could not verify the price with

"other sources because the data do not identify which countries London Metal Exchange

considers to be a part of the Far East Region and the data do not include export quantities"; the

Department could not determine if the data was "based on commercially significant quantities";

and "steel billet is not the input used by Xinjiamei."  Draft Results at 13.  Thus, the Department

concluded that the London Metal Exchange data was not the best available information on the

record because it is less reliable "and may be aberrational in comparison to GTA Indian import

data under HTS 7211.29.90, which is corroborated by record evidence."  Draft Results at 14.

After all of the foregoing comparisons, the Department confirmed its finding in the Final

Results that the GTA Indian Import Data was the best available information on the record.

Commerce found that the GTA Indian Import Data was more reliable than the JSW advertising

data and JSW sales data because it was supported by the GTA data from the other potential

surrogate countries and the JSW sales data and JSW advertised data "are not corroborated by

reliable values and quantities."  Draft Results at 15.

The Department then provided interested parties a week to comment on the Draft Results.

Draft Results at 15; Letter from Charles Riggle, Dep't of Commerce, to Ronald M. Wisla, Kutak

Rock LLP, at 1, PD 11 at bar code 3137194-01 (May 24, 2013), ECF Dkt. No. 38-11.  Plaintiff

filed no comments on the Draft Results and requested no extension of time to do so.

On June 14, 2013, the Department issued the Remand Results.  In the Remand Results,

the Department observed that "Xinjiamei provided no comments to our Draft Results.  As such,

we have determined not to alter the conclusions of our Draft Results and continue to find that the

GTA Indian import data are the best available information for valuing Xinjiamei's cold-rolled

steel coil and that the data are reliable and non-aberrational."  Remand Results 1–2.  The

Department then went on to repeat its conclusions and analysis from the Draft Results nearly

verbatim.

Despite the Remand Results' express reference to Xinjiamei's failure to comment on the

Drat Results, plaintiff makes no mention of its decision not to do so in its submissions before the

court.  Rather, in its five-page brief, Xinjiamei argues that the Remand Results remain

unsupported by substantial evidence because (1) the Department did not expressly "take into

account the sample size of the [GTA Indian Import] data . . . and compare it with the sales

volume of the Indian domestic price data," (2) the Department did not compare like tariff

headings to like tariff headings, (3) the volume of imports under several of the GTA headings in

other potential surrogate countries was smaller than the volume of imports under the GTA Indian

Import Data, (4) the aggregate volume of all of the sales under all of the tariff headings in the

other potential surrogate countries is "only 0.12% of JSW's annual production and 0.012% of

Indian production of cold-rolled steel sheet and coil," and (5) the range of AUVs generated by

the list of potential other surrogate countries "is so large that it is virtually meaningless."  Pl.'s

Cmts. 2–5.

       Based on these objections, Xinjiamei argues that substantial evidence could not have

supported the Department's continued use of the GTA Indian Import Data as the best available

information and asks the court to "remand the case to Commerce a second time and instruct

Commerce to use the POR average of JSW Steel retail prices as the surrogate value for cold

rolled steel coil."  Pl.'s Cmts. 5.  Notably, plaintiff's comments make no mention of its

submission of the London Metal Exchange data.


   II.   Xinjimei Failed to Exhaust its Administrative Remedies by Declining to Comment on the
       Draft Remand Results

       "[W]here appropriate" the court shall "require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d) (2006); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*,

716 F.3d 1370, 1381 (Fed. Cir. 2013).  "'The exhaustion doctrine requires a party to present its

claims to the relevant administrative agency for the agency's consideration before raising these

claims to the Court.'"  *Shandong Huarong Machinery Co. v. United States*, 30 CIT 1269, 1305,

435 F. Supp. 2d 1261, 1292 (2006) (quoting *Ingman v. U.S. Sec'y of Agric.*, 29 CIT 1123

(2005)).  "This court has discretion to determine when it will require the exhaustion of

administrative remedies."  *Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT

__, __, 949 F. Supp. 2d 1311, 1321 (2013).

Requiring exhaustion is appropriate where doing so "can protect administrative agency authority and promote judicial efficiency." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (citation omitted). Exhaustion can "serve judicial efficiency . . . by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution." *Id*. Thus, "[i]n litigation contesting antidumping determinations, the exhaustion requirement applies to a situation such as that existing in this case, in which the Department invited a party to submit comments on draft remand results." *Carpenter Tech. Corp. v. United States*, 35 CIT __, __, 774 F. Supp. 2d 1343, 1349 (2011).

Plaintiff has attempted to make no response to the Department's arguments that it has failed to exhaust its administrative remedies. Xinjiamei makes no mention in its papers of any response it made to the Draft Results or of any communications with the Department that would presage the objections raised here for the first time. Indeed, plaintiff also appears to have nothing further to add to counter the Department's position. In support of its motion to cancel oral argument, Xinjiamei stated that the issues before the court had been "adequately addressed by the parties through comment." Unopposed Mot. to Cancel Oral Arg. 1 (ECF Dkt. No. 39). Accordingly, it is clear from the record that plaintiff failed to exhaust its administrative remedy by declining make its objections before the Department when it had the opportunity to do so in the first instance during the proceedings on remand. Nevertheless, because failure to exhaust administrative remedies is not always fatal to a party's objections to administrative action, the court will consider the two common exceptions to the exhaustion requirement, futility and "pure question of law." In addition, the court will address whether plaintiff had an adequate opportunity to respond to the Draft Results.

The futility exception applies where a party "would be required to go through obviously useless motions in order to preserve their rights." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (citations and internal quotation marks omitted).  A showing of futility requires more than "the mere fact that an adverse decision may have been likely."  *Id*. The factual circumstances in which the futility exception applies generally require that the plaintiff have already "put its argument on the record before Commerce" in such a manner that the agency "had heard everything on the issue that [the party] had to say." *Itochu*, 733 F.3d at 1146, 1147 (finding futility applied where, prior to the preliminary results, the party had "set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position").  In other words, futility can excuse a party from additional practice before the agency when it has already fully presented its arguments to the Department in some form and had those arguments rejected, but not where it declines to present the arguments at all because it believes the agency will be unlikely to accept them.

The futility exception is inapplicable here.  Xinjiamei's arguments presented before the court attack the Department's use of the GTA data from the other potential surrogate countries to explain why the volume of the GTA Indian Import data is not aberrationally small.  The data that plaintiff questions, however, was not placed on the record until the proceedings on remand. Thus, Xinjiamei's first opportunity to respond to it was during the remand proceedings.  The record is clear that plaintiff never raised any of its arguments questioning the use of this data before the Department.  The only submission plaintiff made to the Department as part of the remand proceedings was to supplement the record with the London Metal Exchange data.  As noted, Commerce's rejection of that evidence is an issue plaintiff does not raise before the court.

Accordingly, this is not an instance where a plaintiff has fully made their case before the

Department and additional practice before the agency would have served no purpose.  At a

minimum, responding to the Draft Results would have permitted the Department to clarify its

position by filling in any claimed explanatory gaps (e.g., the size difference between the

aggregated volume of imports under all of the GTA import data sets and the JSW sales data,

whether the range of AUVs yielded by the GTA import data is too large to be meaningful, and

whether the Department's comparison between the eight-digit tariff heading used for the GTA

Indian Import Data and six-digit tariff headings for all of the potential surrogate countries was

impermissible).  Because no argument can be made that raising these issues would have been a

"useless motion," the futility exception is not available to plaintiff.

The "pure question of law" exception applies only where the issue "can be addressed

without further factual development or further agency exercise of discretion."  *Itochu*, 733 F.3d

at 1146 (citing *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007)).  Put

another way, "[s]tatutory construction alone [must be] sufficient to resolve [the] case."  *Consol.*

*Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).  Moreover, even where the

question is one of statutory construction, exhaustion may be required if the Department's

interpretation would be entitled to *Chevron* deference[5] and the Department's position was not

made clear on the administrative record.  *Fuwei Films (Shandong) Co. v. United States*, 35 CIT

__, __, 791 F. Supp. 2d 1381, 1384 (2011) (citing *Chevron U.S.A. Inc. v. Natural Res. Def.*

---

[5]        The *Chevron* line of cases requires the courts to defer to the Department of
Commerce's reasonable interpretation of certain ambiguous statutory provisions.  *See United*
*States v. Eurodif S.A.*, 555 U.S. 305, 315–17 (2009).

*Council, Inc.*, 467 U.S. 837, 842–45 (1984)) ("[I]t is always preferable to have the agency's

interpretation of the statute it is entrusted to administer set forth on the administrative record.").

Plaintiff's objections are not pure questions of law.  Indeed, no question of statutory

interpretation is at issue here.  Each of Xinjiamei's objections bear on factual questions regarding

whether the data relied upon by the Department was sufficiently substantial to support its

determinations.  Accordingly, plaintiff cannot rely on the "pure question of law" exception.

Finally, this is not a case where the plaintiff "did not have a fair opportunity to challenge

these issues at the administrative level."  *Qingdao Taifa Group Co. v. United States*, 33 CIT

1090, 1093, 637 F. Supp. 2d 1231, 1237 (2009).  The Department discussed fully the new

evidence in the Draft Results and its position in the Draft Results was identical to the position it

took in the Remand Results.  The Department's reliance on the new evidence is what plaintiff

now challenges before the court.  Thus, it is apparent that the arguments made in plaintiff's five-

page brief submitted to the court could have been made in the week-long comment period

provided by the Department.  Moreover, had plaintiff believed that it needed additional time to

fully frame its objections to the Draft Results, it could have made a request for an extension of

time to the Department for that purpose.

III.    The Department Has Complied with the Court's Instructions on Remand

The court instructed the Department on remand to "expressly compare the merits of any

acceptable data sets on the record" and "provide an adequate explanation, supported by

substantial evidence, as to why th[e] data [it selects as the best available evidence] is reliable and

non-aberrational."  *Xinjiamei*, 36 CIT at __, Slip Op. 13-30, at 16.  The Department has done so

here.  In selecting the GTA Indian Import Data, the Department compared the AUV generated

from that data to the AUVs of the same inputs if valued from other potential surrogate countries

and reasonably concluded that the similarities in the values demonstrated that the $2.01 AUV

was not aberrational.  The Department also reasonably concluded that the GTA Indian Import

Data's volume was not aberrational by comparing it to that of the other potential surrogate

countries and finding the respective import volumes to be similar.  As instructed, the Department

also expressly considered each other data set on the record, compared each set to the GTA Indian

Import Data, and explained in each instance why it found the GTA Indian Import Data to be the

best available information when compared with that data set.

      As noted in *Xinjiamei*, in reviewing whether the Department's selection of evidence used

to calculated a surrogate value is the best available information, the "court determines not

whether 'the information Commerce used was the best available, but rather whether a reasonable

mind could conclude that Commerce chose the best available information.'"  *Xinjiamei*, 36 CIT

at __, Slip Op. 13-30, at 9 (quoting *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652

F.3d 1333, 1341 (Fed. Cir. 2011)).  However, "[t]o support a surrogate value with substantial

evidence, Commerce 'must do more than simply identify flaws in the data sets it rejects.'"

*Xiamen Int'l Trade and Indus. Co. v. United States*, 37 CIT __, Slip Op. 13-152, at 11 (2013)

(quoting *Guangdong*, 30 CIT at 1417, 460 F. Supp. 2d. at 1369).  The Department must also

"evaluate the reliability of its own choice" and explain why that choice does not yield an

aberrational AUV.  *Shanghai Foreign Trade Enters. v. United States*, 28 CIT 480, 495, 318 F.

Supp. 2d 1339, 1352 (2004).

      The Department's selection of the GTA Indian Import Data is supported by substantial

evidence.  Here, the Department has selected evidence that meets its "preference for data from a

single surrogate country, [that is] publically available, represent[s] a broad market average, [is]

contemporaneous with the POR, [is] tax exclusive, and [is] the most specific HTS category to the

[input] used by Xinjiamei to produce" the subject merchandise.  Remand Results at 15.  Unlike

in *Xinjiamei*, the Department has sufficiently explained why the GTA Indian Import Data does

not yield an aberrational AUV.  To demonstrate that the GTA Indian Import data's AUV falls

within a reasonable range, the Department compared it to the import data from the other potential

surrogate countries.  After finding the AUVs to be comparable in terms of both price and

quantity, the Department also explained why it found that the GTA Indian Import Data is

preferable to the JSW advertising data argued for by the plaintiff.  The explanation for the

Department's choice, that the JSW advertising data is not comparable to the values in the import

data from the other surrogate countries and is less specific to the input used by Xinjiamei, is

reasonable.

        Accordingly, the Department has adequately explained its selection of the GTA Indian

Import Data as the best available information for Xinjiamei's cold-rolled steel coil input and

supported that conclusion with substantial evidence, in compliance with the court's instructions.


                                            CONCLUSION

        For the foregoing reasons, it is hereby

        ORDERED that the Department of Commerce's Final Results of Redetermination

Pursuant to Court Remand are sustained.


                                            ____/s/ Richard K. Eaton_____
                                                Richard K. Eaton


        Dated:        February 18, 2014
                      New York, New York